IDA HACH v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY, Appellant.

Division One, December 24, 1907.

1. **NEGLIGENCE: Defective Track: Demurrer.** The engine was going west and turned over on the right side of the track; a piece of the rail on that side was broken off about six feet from its east end; at the joint at the east end there was a decayed and broken tie; the break was not square off, but slanted down towards the east; at the point where the break was on the west, there was a sound tie; the ball on top of the long piece of the rail was battered at its east end, and that piece was turned over on its side, and a crease ran along its web for some distance; the roadbed had been in this condition for some time; and the engine turned over, and the engineer, plaintiff's husband, was killed. *Held,* that there was sufficient evidence from which it could be inferred that the rail was broken by a train going west, and that the break was due to the rotten tie, and to sustain the charge that defendant was negligent "in permitting the roadbed of its railroad to be in an unsafe and dangerous condition, and in failing to replace the decayed and rotten ties upon which the broken rail rested."

2. ——: ——: **Erroneous Evidence: Harmless.** Under said charge the real issue was whether or not the road was in a reasonably safe condition, and hence it was wholly immaterial whether or not the section foreman had a sufficient force of

men and a sufficient amount of material to keep the road in proper and safe condition, and hence it was not reversible error to permit plaintiff to show there was not a sufficient amount of material and a sufficient force of men to keep the track in safe condition.

3. ———: ———: ———: Increase of Damages. And it will not be held that such evidence increased or might have had a tendency to increase the amount of the verdict, where no such point was at any time adverted to until the case reached the appellate court.

4. ———: ———: ———: Previously Answered. And where practically the same question had been previously asked and answered without objection, it cannot be seen in what manner defendant was injured by that evidence.

Appeal from Butler Circuit Court.—*Hon. J. C. Sheppard*, Judge.

Affirmed.

*Martin L. Clardy, James F. Green* and *E. A. Green* for appellant.

(1)   The court erred in refusing to give to the jury instruction 1 requested by defendant.   It was the duty of plaintiff to prove that the derailment of the engine resulted in consequence of the specific negligence charged in the petition.   McGrath v. Railroad, 197 Mo. 104; Brown v. L. & Co., 65 Mo. App. 163; Trigg v. Land & Lumber Co., 187 Mo. 227; Harper v. Terminal Co., 187 Mo. 575; Breen v. Cooperage Co., 50 Mo. App. 202; Plefka v. Knapp, Stout & Co., 145 Mo. 316; Fuchs v. St. Louis, 167 Mo. 620; Oglesby v. Railroad, 177 Mo. 301; Smart v. Kansas City, 91 Mo. App. 586; Goransson v. Mfg. Co., 186 Mo. 300.   (2)   The court erred in not confining the testimony to the negligence charged in the petition, to-wit: the alleged defective condition of defendant's roadbed and ties.   Root v. Railroad, 195 Mo. 375; Goble v. Kansas City, 148 Mo. 470; Alcorn v. Railroad, 108 Mo. 81; Edwards v. Bar-

ber Asphalt Paving Co., 92 Mo. App. 221; Kolb v. Chicago Stamping Co., 33 Ill. App. 488; Railroad v. Wynant, 114 Ind. 525; Smart v. Kansas City, 91 Mo. App. 594; Coale v. Railroad, 60 Mo. 227; Patton v. Railroad, 87 Mo. 117; Lester v. Railroad, 60 Mo. 265; Newcomb v. Railroad, 182 Mo. 715.     (3) As to employees, defendant was only required to have its roadbed in reasonably safe condition, and as the testimony offered on part of plaintiff showed that the road was in reasonably safe condition for travel, plaintiff was not entitled to recover.     Minnier v. Railroad, 167 Mo. 112; Flynn v. Bridge Co., 42 Mo. App. 529; Wojtylak v. Coal Co., 188 Mo. 260; Pursell v. Shoe Co., 187 Mo. 285; Krampe v. Brewing Assn., 59 Mo. App. 277; Furber v. Bolt and Nut Co., 185 Mo. 301; Glascock v. Dry Goods Co., 106 Mo. App. 657; Kelly v. Railroad, 105 Mo. App. 365; Hach v. Railroad, 117 Mo. App. 17.

*Wilson Cramer* for respondent.

(1)     It is the duty of every railway company to use ordinary care to keep its roadbed and track in a reasonably safe condition, and for a failure so to do it is liable in damages to its operatives who sustain injury by reason of such neglect.     Stoker v. Railroad, 91 Mo. 509; McPherson v. Railroad, 97 Mo. 253; Benedict v. Railroad, 123 Mo. 221.     (2) In the case at bar it is shown by the evidence of every witness who testified that defendant's road at the time and place of the accident was in an unsafe and dangerous condition by reason of the fact that the rails rested on rotten cross ties.     (3) A rail on the north side of the track broke, causing the derailment of the engine, and the uncontradicted proof is that the east end of this rail rested on a rotten tie.     Experienced railroad men testified that the yielding of this rotten tie under the weight of the engine caused the rail to break.

(4)    The evidence shows that the road had been in bad condition as much as six months, or more, and that the section foreman had neither men nor material sufficient to keep up the road.    (5) Defendant's demurrer offered at the close of plaintiff's case was properly overruled.    The demurrer admitted every fact which the jury might infer from the evidence. Barth v. Railroad, 142 Mo. 549.    (6)    Plaintiff's instructions are clear, clean-cut and few, and correctly declare the law.    (7)    Nothing was denied defendant company by the trial court.    All of the instructions asked by it were given, and it was afforded the opportunity to make every defense in the cause.

WOODSON, J.—The plaintiff instituted this suit in the circuit court of Butler county to recover the sum of $5,000 damages for the death of her husband, caused by the alleged negligence of the defendant "in permitting the roadbed of its railroad to be in an unsafe and dangerous condition, and in failing to replace the decayed and rotten ties upon which the broken rail rested by sound and sufficient ties, and having the same properly ballasted," and that in consequence thereof, while her husband, an engineer in the employ of defendant, was running his engine and train of cars over said defective place on said road, it was derailed and turned over and he was caught underneath thereof and crushed and scalded to death by the escaping steam.

The answer was a general denial, and a plea of assumed risks.

There was a trial before the court and jury, and a verdict and judgment for plaintiff for the sum of $5,000; and defendant has duly appealed the cause to this court.

The facts are practically undisputed, and are substantially as follows:

The plaintiff and deceased were husband and wife at the time of his injury and death, and he was an engineer, in the employment of defendant; the accident occurred on a branch line of defendant's road, running from Cairo, Illinois, to Poplar Bluff, Missouri, about one mile west of Sikeston; the train was running west, with deceased in charge of the engine, and when it reached the point above indicated the engine and some ten or twelve of the cars were derailed, and the engine turned over and caught and crushed deceased, and, before he could be released, he was scalded to death by escaping steam.

All the evidence shows that at the point of the accident, and immediately thereafter, it was discovered that from two to six feet of the east end of a rail was broken off, and from two to twenty ties were rotten, some of them very badly, and several of them were broken in two, and that one tie rested under the east end of the broken rail and that it was very rotten, so much so that it had been crushed by the weight of the engine and cars, and had left a depression where it should have been. The evidence also showed that at the point of the break in the rail it rested upon and was spiked to a sound tie, and that the break was slantingly from the top of the rail downward. There was also evidence tending to show that the roadbed was not properly ballasted, that is, there was too much earth and sand in the center of the bed and not enough at each edge thereof, which prevented the ends of the ties from resting on the ground.

We will permit three of defendant's employees to describe the accident in their own language, which is as follows:

C. C. Hardy, who had been a railroad man for twenty-four years, a conductor for the defendant company six years and in its employ for sixteen years, testified:

"Q. I will ask you if you made an examination then to see what caused the wreck, and, if so, I will get you to state what you found and what you did? A. Yes, sir. I made an examination, looked to see what caused the wreck and how it occurred, and, in my opinion—

"Q. What did you see there? A. I saw that there were broken and rotten ties there and a broken rail.

"Q. A broken rail? A. Yes, sir—a broken rail.

"Q. Describe to the jury this broken rail you saw. A. Well, from indications that rail had been broken by a train west-bound, as the ball of the rail was battered and torn as though the flange of the engine wheel had cut down through the rail—it looked like the flange of the engine wheel had cut down in there and thrown the engine over.

"Q. What is the ball of the rail? A. It is the top.

"Q. What do you call the bottom of the rail? A. It is the base.

"Q. And what do you call the space between the bottom and top. A. The web.

"Q. How much of the rail was broken off? A. About six or seven feet.

"Q. You saw that rail broken? I mean what was the character of the break, describe it to the jury? A. Well, it was not a square break of the rail, the rail was cut under, a jagged break.

"Q. What indications, if any, did you see on the long part of the rail? A. The web of the rail was cut as though it had been done by the flange of an engine or car running down it.

"Q. Did you notice anything else besides that cut? A. Not on the web of the rail.

"Q. Notice anything on the ball of the rail? A. Yes, sir; the ball of the rail was battered.

"Q. Which end of it was battered? A. The east end of the rail.

"Q. At what part of the ball? A. Top.

"Q. Top? A. Yes, sir; top.

"Q. Did you fit the two pieces of rail together? A. Mr. Mulkey, roadmaster; Mr. Garner, the bridge foreman, and myself did.

"Q. Was there any indication of the short piece of rail being battered? A. No, sir; there was none.

"Q. If I understand you correctly, the batter was on the top of the east end of the broken long part? A. On the long part, yes, sir.

"Q. By what in your opinion was that end battered? A. My opinion is that it was battered by the wheels of the engine or cars striking it, of a west-bound train. It could not have been done by an east-bound train, because the short part would have been battered, instead of the long.

"Q. Now, Mr. Hardy, I will get you to state if you noticed the ties there? A. The ties immediately where the wreck occurred were all broken and torn up.

"Q. Did you notice the condition of the tie at the place where this broken rail had been connected to the rail immediately east of it? A. That was a rotten tie.

"Q. Did you notice the fish plates? A. Yes, sir; they were broken.

"Q. Attached to the short piece, were they? A. Broken parts of them were.

"Q. I will get you to state what, in your opinion, caused that rail to break? A. Well, there was a weak spot there; the joint tie and the fish plates, or angle bars, being broken allowed the engine to go down and break the rail.

"Q. Was that rotten tie still there under the east end of the rail? A. The rotten tie was there: the roadmaster showed it to me.

*Cross-examination.*

"Q. Then, in your opinion, the weight of the west-bound engine striking that rail caused the rail to break? A. Yes, sir.

"Q. You said it was a west-bound engine, and in your opinion the rail was not broken till that west-bound engine struck it. A. That is my opinion.

"Q. You know, don't you, that a train passed over that same piece of track about ten or fifteen minutes before No. 79? A. I guess they met at Sikeston, that is their meeting place.

"Q. This rail that was there was a standard steel rail, was it; that is, it was a medium weight steel rail? A. Yes, sir.

"Q. What is that, a 60-pound or 75-pound? A. I think it is about a 56-pound rail.

"Q. And on that rail freight trains were running every day? A Yes, sir.

"Q. And over that piece of track freight trains were running every day? A. Yes, sir.

"Q. How many passenger trains? A. A daily passenger train every day."

George Beard, conductor of the wrecked train testified:

"Q. How soon after the wreck did you go to the place of the wreck? A. I was on the rear end of the train—it was some four or five minutes before I got there, not later than that.

"Q. Did you see any broken rails there? A. Yes, sir.

"Q. Tell the jury what you saw in the way of a broken rail? A. Well there were some six or seven feet of the west rail broken off, which joined the east rail, after the wreck occurred.

"Q. Which rail was broken, on which side? A. On the north side.

"Q. What kind of break was that in the rail? A. Well, it was not exactly a square break, it was a little bit under from the ball down to the bottom of the rail.

"Q. The break was a little bit slanting, was it? A. Yes, sir.

"Q. Where was the long part of the rail at the time you saw it? A. It was lying just in front of the other part of the rail, turned on its side.

"Q. Turned on the side? A. Yes, sir.

"Q. Did you notice the ties there? A. A little bit, yes, sir.

"Q. Tell the jury what you saw about the ties at that place. A. I noticed there was some good ties and some bad ones. I noticed one bad one in particular.

"Q. Where was that bad one, that you noticed in particular? A. It was placed under the joint of the rails where they come together.

"Q. Under which rail? A. The north rail.

"Q. The one that broke? A. It was under the joint where the two rails connect.

"Q. What was the matter with the tie? A. I don't know, it was decayed.

"Q. I will ask you to state, Mr. Beard, what, in your opinion as a railroad man, caused that rail to break? A. I cannot possibly explain that—you can give an idea but you cannot say what caused it to break.

"Q. I am asking you for an opinion as an experienced railroad man? A. I think the pressure of the engine broke the rail, there not being sufficient ties under it to hold it up, and it being at a joint where there is an extension between the two rails—when it hit that it broke the end of the rail off.

"Q. What do you mean by the quarter in the rail? A. A quarter is something like four or five feet from the joint.

"Q. Did you notice this rail? Whether the quarter was still fastened to any other tie or not? A. Yes, sir; it was.

"Q. Now, explain to the jury, if you can, how that break was made, in your opinion. A. Well, there was some sound ties in the quarter—some three, four or five feet from the joint, there was a sound tie there. The rail was spiked to a sound tie and the bad tie was under the joint, and my opinion is that an engine, either this engine or some other one that used this track, possibly broke the tie and caused the joint to have play to go down, and the weight being in the quarter, that broke off the rail.

"Q. The giving way of the place under the joint and the rail being fastened to a sound tie caused it to break, is that correct? A. In my opinion, yes, sir.

"Q. What caused the engine to leave the track? A. I cannot say that, the rolling stock or machinery, we cannot tell when that will leave the track.

"Q. I know, but I am asking you your opinion. From the condition of things you found there, what caused the engine to leave the track. A. A broken rail.

"Q. At what rate of speed was your train going? A. I judge about twelve or fifteen miles per hour.

### Cross-examination.

"Q. The part of the rail that was broken, Mr. Beard, was some six or eight feet west of the joint, was it not? A. Yes, sir.

"Q. And the place where the joint of that rail connected with the rail east of it was still connected with the angle bars, was it not? A. Yes, sir.

"Q. That is, they were together? A. Yes, sir.

"Q. Now, the bad tie you speak of was not at the place where the rail broke? A. No, sir; it was not.

"Q. There was a good tie there? A. Yes, sir; a good tie.

"Q. And the place where you say there was a bad tie, or defective tie, was over there further east, under that joint? A. Yes, sir.

"Q. And at that place the angle bars connected the two rails? A. Yes, sir, they were still connected.

"Q. So that the break did not occur at that point —that is, the rail was not broken there? A. No, sir; not at the joint.

"Q. But some six feet or more west of that? A. Yes, sir; west of that.

"Q. Then there was still a portion of rail west of where the break was, was there not? A. Yes, sir.

"Q. To refresh your memory, Mr. Beard, I call your attention to a part of your testimony given in the former trial. I call your attention to this question to you and this answer given by you: 'Q. Then you have been working on the railroad for twenty-two years? A. Yes, sir. Q. Tell the jury whether or not in your judgment the railway roadbed at the place of this wreck was in a reasonably safe condition? A. Yes, sir; I think so.' That question was asked and answered by you? A. Yes, sir.

"Q. That was your judgment at that time? A. Yes, sir.

"Q. You were running a train over that road every day? A. Yes, sir; every day.

### Redirect Examination.

"Q. What is the roadbed, Mr. Beard? A. The roadbed is the part of the road that we call ballast—made of cinders, gravel, sand and such as that.

"Q. In the term roadbed you do not include ties and rails, do you? A. No, sir; not in the roadbed."

E. E. Arthur, defendant's section foreman in charge of the section on which the accident occurred, testified as follows: That he had been section foreman for defendant for four years; that his section was eighty-seven and was eight miles in length, and extended four miles each way from Sikeston; that he noticed one broken rail at the wreck on north side of road and that the engine was on the north side also.

"Q. Now, you may tell the jury how that rail was broken—I mean describe how it looked? A. It was broken about something like six feet off of the east end. The short piece was still fastened by the angle bars to the good rail, the other piece was lying on its side.

"Q. The long piece? A. The long piece was turned on its side.

"Q. What do you call the top of the rail? A. Ball.

"Q. The bottom of the rail? A. Base.

"Q. And the part between the two? A. Stem or web.

"Q. Well, now, this long piece was lying on its side—did you notice any marks on the web of the long piece? A. I noticed a mark the full length of the long piece.

"Q. What kind of a mark? A. Looked like it might have been made with the flange of a wheel.

"Q. Did you examine the long piece of rail? A. Yes, sir.

"Q. You may tell the jury what kind of a break it was in that rail? A. Well, it was not exactly a square break—it was something of an angling shape.

"Q. Was it broken in a slanting direction like that? (Witness shown tracing on paper.) A. Something like that—hardly so much of a slant.

"Q.   Now, if you noticed the ball of the long piece of the rail, I will ask you to state what you saw on that, if anything—any marks?     A.   I did not notice anything except that the end was battered.

"Q.   Tell the jury where the end was battered? A.   Right on top of the ball of the rail.

"Q.   Where was that battered part with reference to the break?     A.   I do not understand you.

"Q.   Well, if this pencil is the ball of the rail, and the break is here (indicating) where was the battered part?     A.   Right at the top—right at the end of the long piece.

"Q.   Where the break had occurred?     A.   Right at the break.

"Q.   I will ask you to state to the jury by what that battered condition of the ball of the rail was produced, if you know?     A.   Well, I do not know, but I think it was caused by the train going west battering the end of the rail.

"Q.   How long have you been a railroad man?  A. About seventeen years, since I first began.

"Q.   Seventeen years?     A.   Yes, sir.

"Q.   Have you been continuously in the employ of the Iron Mountain?     A.   No, sir.

"Q.   But for the last four years you have been in the employ of the Iron Mountain?     A.   Yes, sir.

"Q.   I will get you, Mr. Arthur, to describe to the jury the condition of the short piece of the rail, which you said was about six feet long, did you not?     A. Yes, sir.

"Q.   Tell them where that was lying and what appearance that presented?     A.   The short piece of the rail was setting workway on its base, still fastened by the angle bars—the angle bars were broken in two.

"Q.   What do you mean by workway?   A.   Seting upon its base.

"Q. Still fastened to the angle bars? A. Yes, sir.

"Q. Were the angle bars fastened to anything else? A. Fastened to the good rail east of that.

"Q. What are the angle bars? A. The angle bars are the fasteners that fasten the rails together.

"Q. How are they put on? A. With bolts.

"Q. What are they—describe them to the jury? A. I do not know whether I can exactly—two pieces of iron with holes through them, and we use bolts to fasten the rails together.

"Q. One on each side of the rail where they join, and bolts fasten through them? A. Yes, sir.

"Q. Those are what you call angle bars? A. Yes, sir.

"Q. This short piece of the rail was still fastened to the rail east of the broken one? A. Yes, sir.

"Q. Were the angle bars broken? A. Yes, sir.

"Q. I will ask you to state what, in your opinion, from what you saw there, caused the breaking of the rail? A. I do not know what caused the breaking of the rail.

"Q. Well, your opinion? A. They break in various ways. It might have been caused by a flaw in the rail, or by a bad tie.

"Q. From what you saw, what was your opinion? A. I cannot say.

"Q. What was the condition of the tie under the joint? A. Tie was bad.

"Q. What was the matter with it? A. Well, it was broken in two and it was partially decayed.

"Q. That partially decayed and broken tie was under the joint? A. Yes, sir.

"Q. I will ask you to state what, in your opinion, caused the engine to leave the track at that place? A. I do not know.

"Q. Well, you have an opinion about it, have you not? A. I never formed an opinion.

"Q. You formed no opinion about what caused the engine to leave the track? A. No, sir.

"Q. Have you not expressed the opinion before, that the breaking of the rail caused the train to leave the track?

"Objection by defendant, because he said he had formed no opinion.

"Objection overruled by the court, to which ruling defendant then and there duly excepted.

"Q. Do you remember? A. No, sir.

"Q. Now, then, I will ask you to state, Mr. Arthur, what your duties were as section foreman? A. Keep the track in repair and fences, and telegraph lines to a certain extent.

"Q. What do you mean to a certain extent? A. Keep the track in repair altogether, so far as we are able to—telegraph lines, whenever we find a broken wire, to repair it and notify the lineman.

"Q. I will ask you to state to the jury how long before this wreck you had done any work on this particular place of the road where the accident occurred? A. I do not remember—something like six or seven months—I suppose.

"Q. Had you put any new ties in there at any time within six months before this accident? A. I do not think I had—do not remember.

"Q. Now, Mr. Arthur, I will get you to state to the jury what the condition of the railroad was at the place of this wreck on the 25th day of February, 1904? A. I do not know whether I can answer that question satisfactory or not. The road at that point, so far as ties and rails go, was in about as good condition as it was any place on that end of the section.

"Q. I am not asking you about that—I am asking you what the condition of the track was at that place

on the 25th day of February, 1904?    A.    That is all the answer I can give you.

"Q.    What was the condition of the other part of the road?    A.    I can not say it was good.

"Q.    Tell the jury, Mr. Arthur, why this road was not in good condition?    A.    Well, if we were allowed the material and men that we should have had, I guess the road would have been in better condition than it is in.

"Q.    If I understand you, then, you did not have material and men to put the road in better condition, is that correct?    A.    Yes, sir.

"Q.    Who is your immediate superior, or was your immediate superior, on your road.    A.    Mr. Mulkey is the roadmaster—he was at that time.

"Q.    You was the section foreman working under the roadmaster?    A.    Yes, sir.

"Q.    Now, I will ask you again how many men you had on that eight miles of road?

"Objection by defendant as incompetent, for the reason that there is no averment in the petition as to any defect of track, due to the failure of not having a sufficient number of men.

"Objection sustained.

"Q.    Did you have at that time, or previous to this wreck, a sufficient force of men and a sufficient amount of material to keep that road in proper and safe condition?

"Objection by defendant, for the reason that there is no averment in the petition as to having an insufficient number of men or an insufficiency of supplies on that part of the road.

"Objection overruled, to which ruling of the court the defendant then and there excepted.

"Q.    State whether you had a sufficient number of men and a sufficient quantity of material to keep that

road in as good condition as it should have been? A. No, sir.

"Q. Was this decayed tie you saw there still under the rail that was immediately east of the broken rail, do you remember, at the time you saw it? A. I think it was, I am not sure.

## Cross-Examination.

"Q. The part of the rail that you saw was broken off—assuming this pencil to be lying east and west, the east end towards Charleston and the west end towards Poplar Bluff—the break in the rail, you say, was some six feet from the east end? A. Yes, sir.

"Q. And the long part of the rail was the part that you think was struck by the engine going west— that is, the long part here (indicating)? A. Yes, sir.

"Q. You think that the engine ran over this part (indicating) and that the weight of the engine broke the rail, as you say? A. I did not mean to say it broke the rail—I say the rail was broken.

"You found the rail broken? A. Yes, sir.

"Q. You don't know what caused the rail to break? A. No, sir.

"Q. And have you never formed an opinion to this time? A. No, sir.

"Q. Now, this part (indicating) the east end you say was still attached by the angle bars to the rail immediately east of that? A. Yes, sir.

"Q. That part of the broken rail then was still attached to the rail next to it, and connected by the angle bars which fastened the two rails at the point of intersection? A. Yes, sir.

"Q. You say these angle bars were broken? A. Yes, sir.

"Q. But the two rails were still attached by portions of the angle bars? A. Yes, sir.

"Q. And the rail broke beyond the angle bars? A. Yes, sir.

"Q. Now, that is the condition you discovered when you got there about an hour after the wreck? A. Yes, sir.

"Q. In that connection, Mr. Arthur, for the purpose of refreshing your memory, I call attention to this question to you and the answer given by you on the former trial of the case: 'Q. What kind of ties were there at that place of the wreck? A. The ties were sound where the rail was supposed to be broken.' You made that answer did you? A. As well as I remember, I did.

"Q. That was correct? A. Yes, sir.

"Q. Now, you had gone over that road from day to day, had you not, Mr. Arthur, as section foreman? A. Yes, sir.

"Q. Could you, and did you, in going over that piece of track, noticing the rails as you went along there, discover that there was such a piece of track there as would justify you, as foreman, in saying that a train could not run over it? A. No, sir.

"Q. You did not detect anything of that kind? A. No, sir.

"Q. And it was your duty as section foreman to go over the track and inspect it? A. Yes, sir.

"Q. Now, Mr. Arthur, you say you had not discovered any defect in that track? A. No, sir; I discovered no defect.

"Q. Were trains running over it every day—passenger and freight trains? A. Yes, sir.

"Q. Was that track then such as you would say, as a railroad man, in a reasonably safe condition for trains to run over it, and did not trains run over it day after day—they did, did they not? A. Yes, sir.

"Q. What train had passed over that portion of

track just a few minutes before this No. 79? A. No. 78, local freight.

"Q. In which direction was it going? A. East.

"Q. About how many minutes before this accident occurred did it pass over the road? A. Something like fifteen or twenty minutes.

"Q. I will call your attention to this question to you and answer given by you on the former trial, Mr. Arthur: 'Q. I will ask you, if the ties on each side of the broken one at the joint was sound or not? A. To the best of my recollection they were both sound.' Is that correct? A. Yes, sir."

At the close of plaintiff's evidence the defendant asked a demurrer thereto, which was, by the court, overruled, and defendant duly excepted.

And thereupon the court, at the request of plaintiff, gave to the jury the following instructions:

1. "The court instructs the jury that if they find from the evidence that William Hach was a locomotive engineer, and was employed as such by the defendant railroad corporation to run freight trains over the Cairo branch of its road leading from Cairo to Poplar Bluff, then the defendant owed him, as such employee, the duty of using ordinary care to keep the track and roadbed of its said railroad in a reasonably safe and secure condition for the passage of such trains; and the court further instructs you that in the absence of knowledge to the contrary, the servant, while in the performance of his work, has the right to presume that the master has properly discharged his duty, and does not assume risks, which may be shown by the evidence to have resulted from any omission or neglect of duty on part of the master."

2. "And the court further instructs you that if you find from the evidence that Ida Hach, the plaintiff in this cause, was the wife of William Hach, and that he was killed on the 25th day of February, 1904,

while in the discharge of his duty as a locomotive engineer for defendant, by the derailment and over-turning of his engine, and that such derailment and overturning of his engine was caused by the breaking of one of the rails of said railroad, and you shall further find from the evidence that the defendant railroad company failed to use ordinary care to keep its roadbed and track in a reasonably safe condition for the operation of trains, and that at the time and place of the accident, said railroad was out of repair and was unsafe, by reason of there being unsound and decayed ties under the rail which broke; and you further find from the evidence that the defendant knew, or by the exercise of ordinary care, might have known these facts, then if you find from the evidence that the breaking of said rail and the derailment of said engine were due to such condition of the road and such unsound and decayed ties, your verdict should be for the plaintiff."

3. "If you find the issues for the plaintiff, you should assess her damages at such sum, not exceeding five thousand dollars, as you may deem just and fair under the evidence of this cause, with reference to the necessary injury resulting to her from the death of her husband, and in estimating such damages, you may take into consideration his age, the condition of his health and his earning capacity at the time of his death, as shown by the evidence."

To the giving of which instructions, on part of the plaintiff, defendant at the time objected and excepted.

The court then gave eight instructions at the request of defendant, but as they are not involved in this appeal they will be noticed no further.

As before stated, the judgment was for the plaintiff, and defendant appealed; and it assigns the following errors, to-wit:

"FIRST.    The court erred in refusing to give the demurrer to the plaintiff's evidence.

"SECOND.    The court erred in giving instructions one, two and three for plaintiff.

"THIRD.    The court erred in admitting improper testimony offered by the plaintiff."

I.    The first assignment of error presented by defendant is that the trial court committed error in refusing to give its demurrer to plaintiff's evidence.

The law of this State is too firmly established to need the citation of authorities to show that the demurrer admitted as true every fact and legitimate inference which a jury might infer from the evidence before it.    [Barth v. Railroad, 142 Mo. 535-549.]

This rule of evidence calls for a brief summary of the evidence in order that we may determine what facts and inferences the jury was warranted in drawing therefrom.    The following facts are undisputed:    The engine was going west and turned over to the right; a piece of the rail about six feet in length was broken off of the east end thereof; that there was a decayed tie just underneath the joint of the east end of the broken rail and the rail lying just east of it; that rail rested upon a sound tie at the point where it broke; that the decayed tie was broken and mashed, which left a depression where it should have been; that the east end of the long piece of the broken rail was battered on the ball or upper side as if struck with a sledge hammer or some heavy weight; the long piece of the rail was turned over on the side and had a crease along the entire web, that is, on the thin part between the ball and base; and that the road had been in bad condition for several months.

From these facts we think it was clearly inferable, and that the jury was warranted in finding that, when the engine struck the joint of the two rails just over the rotten tie, it broke and gave way, thereby per-

mitting the end of the rail to sink down into the said depression, and thereby caused the rail to break or snap at the point just over the sound tie, which acted as a fulcrum upon which the rail rested. This conclusion is irresistible when we consider the point of the break, the sound tie at that point, the size of the rail and the great weight of the engine.

This inference, taken in connection with the undisputed fact that the ball of the east end of the long piece of the rail was battered as if struck with a heavy sledge, demonstrates almost conclusively that the train was going west and when it struck the point of the rotten tie it gave way, thereby causing the east end of the rail to snap or break, and when the wheels of the engine struck the east end of the long piece of the broken rail, they beat and pounded the ball as with a sledge, which tore it loose from the ties and caused it to turn over on its side, and was passed over in that prostrate form by some of the wheels of the engine, which is indicated by the crease on the web thereof, and when the end of the displaced rail was reached the engine must have left the track as if passing over and off of an open switch.

These inferences are not only legitimately and logically deducible from the facts of the case but they are expressly corroborated in every detail by two of the witnesses, who were experienced railroad men and were in the employment of defendant.

We are not only of the opinion that there was sufficient evidence to carry the case to the jury, but are unable to see how their verdict could have been otherwise; and we must, therefore, hold that the court properly refused the demurrer asked, and committed no error in submitting the case to the jury.

II. It is next insisted by defendant that the court erred in admitting in evidence the following question and answer of witness Arthur, the section foreman of

defendant, to-wit: "Q. Did you have at the time, or previous to this wreck, a sufficient force of men and a sufficient amount of materials to keep the road in proper and safe condition? A. No, sir."

The ground assigned by defendant for its objection to the admission of this evidence is based upon the fact that there is no issue made by the pleadings in the case that defendant was negligent in failing to furnish sufficient men and material with which to keep the road in safe condition.

It is true no such allegation is contained in the petition, and speaking for the writer and GRAVES, J., only, we think the court erred in the admission of that evidence. It was wholly immaterial and irrelevant to any issue presented by the pleadings and on that account should have been excluded from the jury; but we are all of the opinion that even though the admission of that evidence was erroneous, yet we are unable to see in what possible way it operated to the prejudice or injury of the defendant. The real issue in the case was whether or not the road was in a reasonably safe condition, and the jury found it was not, and it is wholly immaterial why that was true. Whether it was caused from the failure to supply sufficient men and materials with which to keep it in good condition, or whether it was the negligence of the company in failing to have the men actually furnished to do the work and make the repairs, is entirely immaterial in so far as the issues of this case are concerned. The road was found to be out of repair and in a dangerous condition, and the cause thereof is not an element which entered into the liability or non-liability of defendant.

Especially are we unable to comprehend in what manner the defendant was injured by that evidence when the record discloses the fact that practically the same question had been asked and answered by the witness, without objection, just prior to the admission

of the evidence complained of. The evidence was then before the jury, and the repetition of the question and answer under the facts and circumstances clearly produced no prejudicial effects upon defendant's case.

If we correctly understood counsel for defendant in his oral argument, he laid much stress upon the fact that such evidence might or would have a tendency to so influence the minds of the jurors against defendant as to induce them to increase the amount of the verdict. In reply to that contention it is sufficient to say that there is no intimation shown by this record that such a thing was done, or that any such thought ever entered the minds of the court, counsel or jury, until after the case reached this court. If any such question had been submitted or argued to the jury quite a different proposition would be here for consideration; but under the present state of the record no court would be justified in disturbing the verdict of the jury.

III. The last assignment of error regards the instructions given for the plaintiff. The objection to them is general, and no specific criticism is pointed out by counsel for defendant. We have carefully read all of them and have been unable to detect any error in them, but, upon the other hand, we are of the opinion that they fully and fairly presented the issues to the jury; and, finding no error in the record, the judgment is affirmed.

All concur.